Richard McCREARY and Randy Siebert, on Behalf of Themselves and Others Similarly Situated, Appellants,

v.

BAY AREA BANK & TRUST, Appellee.

No. 14–00–00156–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 26, 2001.

Daniel J. Petorski, Fleming Hovenkamp & Grayson, P.C., Houston, for appellants.

John McEldowney, Greer, Herz & Adams, L.L.P., Galveston, Charles Eugene Baumann, Locke, Liddell & Sapp, LLP, Houston, Frederick J. Bradford, McLeod, Alexander, Powel & Apffel, P.C., Galveston, Ronald D. Krist, Krist Law Firm, P.C., Herbert T. Schwartz, Williams Bailey Law Firm, L.L.P., Mallory Wade Turner, Houston, for appellee.

Panel consists of Justices ANDERSON, HUDSON, and SEYMORE.

## OPINION

HUDSON, Justice.

Appellants are customers of Bay Area Bank & Trust (now operating as Horizon Capital Bank). When the bank allegedly breached its deposit agreement with appellants, a class action suit was brought against the bank under a variety of contract and tort claims. Because the only contested issue is the interpretation of the deposit agreement, the bank sought summary judgment. The trial court granted the bank's motion for summary judgment. We affirm.

The summary judgment proof indicates that in 1983 the bank began to run the following advertisement:

### 10% RETURN

### Guaranteed for Life On Individual Retirement Accounts

Bay Area Bank & Trust is the only bank in the Bay Area that . . .

√ guarantees rates for 18 months

√ guarantees a minimum return of 10% for life

In 1985, after viewing the advertisement, Richard McCreary and Randy Siebert each opened an individual retirement account. The deposit contract provided that funds deposited in an IRA would be invested "in interest-bearing savings accounts." This interest-bearing account was further described in a typewritten addendum as an "18 month time open savings account."[1] Thus, the funds placed into an IRA would, in turn, be deposited in a savings account with a fixed interest rate for 18 months. At maturity, the funds would be reinvested routinely into a new savings account with a new interest rate fixed for yet another 18 months. The addendum provided, howev-

---

1. The Internal Revenue Service has generally defined time deposit open account arrangements as follows:

    The term time deposit open account arrangement means an arrangement with a fixed maturity date where deposits may be made from time to time and ordinarily no interest will be paid or constructively received until such fixed maturity date.
    26 C.F.R. § 1.1232–3A (2001).

er, that "the minimum rate of interest paid will never be less than 10%." [2]

In 1987, due to changing economic conditions, the maximum money market interest rate fell below 10 percent. The bank, however, continued to pay at least 10 percent interest on its IRA savings accounts. Thus, the bank began losing money on the program. In 1991, the bank amended the terms of the savings accounts to provide for (1) simple, rather than compound, interest, (2) a service fee, (3) and a twelve month, rather than an eighteen month, maturity period. Despite these amendments, the bank concluded in the mid–1990's that it could not afford to continue paying 10 percent interest. Accordingly, the bank gave written notice to appellants that upon maturity of their current savings accounts, the rate of interest on new savings accounts in their IRA's would fall below 10 percent.

In 1997, appellants sued the bank for breach of contract, fraud, fraudulent concealment, negligence, and gross negligence. Relying on representations made at the time the accounts were opened, as well as the express terms of the deposit contracts, appellants alleged that the bank either misrepresented the interest rate or breached the terms of the deposit agreement. The bank responded to appellants' suit with a motion for summary judgment in which it argued that appellants' claims fail as a matter of law because it was authorized by Section 34.302 of the Texas Finance Code to unilaterally reduce the rate of interest on all accounts having no maturity date.

Appellant presents two issues: (1) Does the addendum to the deposit contract guarantee a minimum rate of interest of 10 percent for the life of the contract?; and (2) Does the deposit contract have a fixed maturity date?

## Contract Provisions Regarding Interest

■■■ When interpreting the provisions of a written contract, we must consider the document as a whole, and read each part in light of all other parts. *City of Bunker Hill Village v. Memorial Villages Water Authority*, 809 S.W.2d 309 (Tex.App.—Houston [14th Dist.] 1991, no writ). If the contract is worded in such a manner that it can be given a definite or certain legal meaning, it is not ambiguous. *Friendswood Development Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex.1996). However, if the meaning of the contract is uncertain and doubtful or is reasonably susceptible to more than one meaning, it is ambiguous. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Whether a contract is ambiguous is a question of law for the court to decide. *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 503 (Tex.App.—Waco 1997, pet. denied). Moreover, a court may con-

---

**2.** The typewritten addendum specifically provided:

> Depositor hereby agrees to allow Bay Area Bank & Trust to deposit funds into:
>> 18 month time open savings account at 6 month money market rates or 30 month money market rates, whichever is greater (variable monthly).

> Depositor hereby agrees that the minimum rate of interest paid will never be less than 10%.
> Depositor hereby agrees that the minimum rate for early withdrawal penalty will be the rate in effect on the date of withdrawal.

clude that a contract is ambiguous even in the absence of such a pleading by either party. *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993).

■ Here, the contract contains two provisions regarding the interest to be paid. First, the contract generally provides:

Under Individual Retirement Accounts, the funds deposited with the Custodian are deposited in interest-bearing savings accounts and, when permitted, time deposits. The interest rates that may be paid, and the period, if any, over which that rate is guaranteed are controlled by regulations issued by Federal and/or State authorities.

Second, an addendum to the contract provides that "the minimum rate of interest paid will never be less than 10%."

Appellants contend the addendum unequivocally guarantees a return of not less than 10 percent interest on all funds deposited in an IRA. The bank, on the other hand, asserts that under the terms of the contract, an IRA earns *no* interest; rather, interest is paid only on the "interest-bearing savings accounts and ... time deposits" within the IRA's. Thus, the bank claims it promised to pay at least 10 percent interest only for the life of the interest-bearing vehicles, i.e., the 18 month savings accounts. When the first savings accounts expired at the end of their 18 month maturity periods, the bank contends it was released from its obligation to

pay at least 10 percent interest. The bank argues this is the only reasonable construction of the addendum in light of certain contract provisions granting it authority to amend the terms of the IRA at any time.[3]

■ We are obliged, if possible, to give effect to all the terms of a contract so none will be rendered meaningless. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). To construe the addendum as merely a promise to pay interest on an interest-bearing savings account until the date of its maturity would render it redundant. Construed in this fashion, the addendum would be a superfluous agreement to abide by an agreement. Such a construction is contrary to the plain words of the addendum, namely, that "the minimum rate of interest paid will *never* be less than 10%." (Emphasis added).

■ In construing a contract, we must determine and give effect to the intent of the parties. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 727–28 (Tex.1981). When determining the intention of the parties, we will consider all the pertinent provisions of the contract and harmonize, if possible, those provisions which appear to conflict by using the applicable rules of construction. *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex.1983). One general rule of construction is that when there is a conflict between two provisions, the specific provi-

3. The deposit agreement expressly provides for amendment of the contract "from time to time to comply with the provisions of the [Internal Revenue] Code and related regulations." The contract further provides: "Other amendments may be made with the consent of the persons whose signatures appear below." However, the contract also makes reference to a "disclosure statement" which provides:

The Custodian of this Account may amend (change) the Account at any time. The Custodian shall furnish copies of any such amendments (changes) to the Account Owner within 30 days of the date the amendments (changes) are to become effective.

sion controls over the general provision. *Ostrowski v. Ivanhoe Property Owners Improvement Ass'n, Inc.*, 38 S.W.3d 248, 254 (Tex.App.—Texarkana 2001, pet. denied). Moreover, to the extent that typewritten provisions of a contract conflict with printed provisions, the typewritten provisions must be given effect over the printed provisions. *Meisler v. Republic of Texas Sav. Ass'n*, 758 S.W.2d 878, 884 (Tex.App.—Houston [14th Dist.] 1988, no writ); *also McMahon v. Christmann*, 157 Tex. 403, 303 S.W.2d 341, 344 (1957); *Easy Living, Inc. v. Cash*, 617 S.W.2d 781, 785 (Tex.Civ.App.—Fort Worth 1981, no writ). The rationale for the rule is that typewritten provisions are the immediate language and terms selected by the parties themselves as setting forth their intentions, whereas the printed form is intended for general use without reference to particular objects and aims. *Leslie Lowry & Co. v. KTRM, Inc.*, 239 S.W.2d 898, 900 (Tex.Civ.App.—Beaumont 1951, no writ). Here, the printed portion of the contract authorizes the bank to unilaterally change any provision of the deposit contract with proper notice. The typewritten provision provides, however, that the interest rate will never fall below 10 percent. Thus, the typewritten provision is more specific than the printed provision.

Applying these rules of construction, we find there is no "conflict" between the typewritten addendum and the printed contract. The addendum is an exception to the general contract provisions and reserves one term of the agreement which cannot be amended by the bank, i.e, the interest rate may not be reduced below 10 percent. Hence, the deposit agreement is not ambiguous.

Accordingly, the contract provides that the bank may unilaterally amend any term of the deposit contract *except* its promise to pay at least 10 percent interest. Thus, we find the bank agreed to pay no less than 10 percent interest on all savings accounts in the IRA's for as long as appellants maintained their IRA's with the bank.

### Maturity Date

Notwithstanding the express terms of the contract, the bank contends it is statutorily authorized to unilaterally alter the interest rate on all accounts having no maturity date. *See* TEX. FIN.CODE ANN. § 34.302 (Vernon 1998).[4] Appellants do not dispute the effect of the statute, but claim it is not applicable here because an IRA has a discernible "maturity date" in that the Internal Revenue Service has established certain deadlines regarding when the interest in an IRA must be distributed. *See* 26 C.F.R. § 1.408–2 (2000). However, the IRS Treasury Regulations impose a burden upon the depositor, not the bank; namely, they provide severe monetary penalties for the depositor if he should take insufficient or late distributions of the income from his IRA. These regulations prevent an account from existing in perpe-

---

**4.** Section 34.302 of the Finance Code provides, in pertinent part:

(b) A bank may amend a deposit contract by mailing a written notice of the amendment to the account holder, separately or as an enclosure with or part of the account holder's statement of account or passbook. The notice must include the text and effective date of the amendment.... The effective date may not be earlier than the 30th day after the date of mailing the notice....

(d) An amendment under Subsection (b) may reduce the rate of interest or eliminate interest on an account without a maturity date.

(e) Amendment of a deposit contract made in compliance with this section is not a violation of the Deceptive Trade–Practices Consumer Protection Act (Section 17.41 et seq., Business & Commerce Code).

tuity, but they do not constitute nor establish a "maturity date." The term "maturity date" means, in common usage, the "date on which the principal amount of a note, draft, acceptance, bond, or other debt instrument becomes due and payable." BLACK'S LAW DICTIONARY 979 (6th ed.1990). Accordingly, we find appellants' individual retirement accounts have no "maturity date."

### Statutes and Public Policy

■ The tension between the express provisions of the deposit contract and the Finance Code is readily apparent. The bank contracted with appellants that it would never reduce its interest rate below 10 percent. However, section 34.302 authorizes the bank to unilaterally amend its interest rate at any time. Whether the deposit contract is legally enforceable or binding is a question of law. *Montanaro v. Montanaro*, 946 S.W.2d 428, 430 (Tex. App.—Corpus Christi 1997, no pet.).

■ The relationship of a bank to a general depositor is contractual in nature.[5] *American Bank of Waco v. Waco Airmotive, Inc.*, 818 S.W.2d 163, 170 (Tex.App.—Waco 1991, writ denied). However, it is well settled that the laws which are in existence at the time of the making of the contract enter into and become a part of such contract as if expressly referred to or incorporated therein. *Griffin's Estate v. Sumner*, 604 S.W.2d 221, 230 (Tex.Civ. App.—San Antonio 1980, writ ref'd n.r.e.). Where a contract is made in violation of a statute, it is illegal and void. *Richmond Printing v. Port of Houston Authority*, 996 S.W.2d 220, 224 (Tex.App.—Houston [14th Dist.] 1999, no pet.). Where nothing in the contract requires a violation of the law, such contract is not illegal. *Corporate*

*Leasing Intern., Inc. v. Groves*, 925 S.W.2d 734, 738 (Tex.App.—Fort Worth 1996, writ denied). While section 34.302 may permit the bank to abrogate the terms of its deposit contract, there is nothing in the contract presented here that *requires* a violation of the law. Accordingly, we do not deem the deposit contract to be illegal.

■ Normally, if a contract is not illegal, it is enforceable. However, it is well settled that a contract which violates public policy is void. *Montgomery v. Browder*, 930 S.W.2d 772, 778 (Tex.App.—Amarillo 1996, writ denied). As quasi public institutions, the financial soundness of the banks of this state is a matter of public concern. *Foster v. City of Longview*, 26 S.W.2d 1059, 1061 (Tex.Comm'n.App.1930, judgm't adopted). Further, the Legislature has been charged with the responsibility of enacting laws regulating state banks in a manner that "will adequately protect and secure the depositors and creditors thereof." TEX. CONST. art. XVI, § 16(a).

A bank, like any business, exists to make a profit. To attract customers, banks will always be driven by competitive market forces to offer the highest possible interest rate they can afford and still remain a profitable enterprise. Changing economic conditions, however, can quickly alter interest rates. Without the ability to amend the terms of a deposit contract, those banks who were most successful in attracting new customers during good times would be the ones most likely to fail in bad times. Bank failures tend to exacerbate economic difficulties. We assume the legislative intent of section 34.302 of the Finance Code is to prevent a danger-

---

**5.** Money deposited in an IRA is a general deposit. *Lee v. Gutierrez*, 876 S.W.2d 382, 387 (Tex.App.—Austin 1994, writ denied).

ous downward spiral that could ultimately result in an economic collapse.

 We are not unmindful, however, that section 34.302 renders many deposit contracts somewhat illusory. This is particularly troubling where, as here, the bank attracted customers with the promise that its interest rate would *never* fall below 10 percent. Nevertheless, we find the plain wording of section 34.302, and the public policy considerations it promotes, render the addendum to the deposit contract unenforceable and void.[6]

Accordingly, the judgment of the trial court is affirmed.[7]

6. Where a contracting party agrees to perform separable acts, and one is void, the invalid provision may be severed from the valid provision and the valid provision enforced if the intent of the parties is not thereby frustrated. *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 662 (Tex.App.—Dallas 1992, no writ).

7. During oral argument, appellants' counsel abandoned his remaining tort claims. Thus, we need not address the issue of whether section 34.302 negates appellants' tort claims and/or whether such claims sound only in contract.